| | |
|---|---|
| 1 | Deanna R. Rader (SBN 020448) |
| 2 | Jamie L. Mayrose (SBN 024190) |
|   | RADER MAYROSE, LLP |
| 3 | 812 North Second Avenue |
|   | Phoenix, Arizona 85003 |
| 4 | Telephone: (602) 384-2292 |
| 5 | drader@radermayrose.com |
|   | jmayrose@radermayrose.com |
| 6 | |
| 7 | Attorneys for Plaintiffs |
|   | Dean Allen Burri and Burri Law, P.A. |

JUL 2 7 2020
CLERK OF THE SUPERIOR COURT
R. MERINO
DEPUTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| BURRI LAW, P.A., a Florida professional association, DEAN ALLEN BURRI, a Florida resident; | Case No.: CV2020-008713 |
| Plaintiffs, | COMPLAINT |
| vs. | ELIGIBLBE FOR COMMERICAL COURT |
| WILLIAM C. SKURLA, an individual; KURT RICHARD BURNETT, an individual; MILAN LACH, an individual; METROPOLITAN ARCHDIOCESE OF PITTSBURGH, BYZANTINE RITE, a Pennsylvania non-profit corporation, BYANTINE CATHOLIC DIOCESE OF PARMA, an Ohio non-profit corporation; EPARCHY OF PASSAIC, a New Jersey non-profit corporation; ABC Entities 1-10; John and Jane Does 1-10, | PROPOSED DISCOVERY TIER: 3 |
| Defendants. | |

Dean Burri and Burri Law, P.A. (collectively "Plaintiffs") file this Complaint against

Defendants and allege as follows:

## PARTIES

1. Burri Law, P.A. is a Florida law firm formed as a professional association with a focus on assisting clients with employee benefits, including ERISA. The firm was founded in 2013 and since that time, almost 100% of Burri Law P.A. clients have been entities related to the Catholic Church.

2. Mr. Dean Burri is an insurance broker and lawyer who owns and operates Burri Law. Mr. Burri has a long history of working with Catholic entities and employee benefits plans. As an insurance broker, Mr. Burri worked with the Catholic Church for almost thirty years. As a lawyer, he continued this focus and almost exclusively represented entities associated with the Catholic Church.

3. Defendant William C. Skurla, a single individual, who resides in Pennsylvania, is the Archbishop of the Byzantine Catholic Archeparchy of Pittsburg and intentionally directed conduct toward the State of Arizona.

4. Defendant Metropolitan Archdiocese of Pittsburgh, Byzantine Rite, also known as the Byzantine Catholic Archeparchy of Pittsburg (hereinafter "Archeparchy of Pittsburg"), is a Pennsylvania non-profit corporation.

5. Defendant Skurla, as an employee and/or agent of Archeparchy of Pittsburg, directed conduct toward the State of Arizona; such conduct was done in the course and scope of his employment/agency. As such, the Archeparchy of Pittsburg is liable for the actions of Defendant Skurla under *respondeat superior*.

6. Defendant Kurt Richard Burnett, a single individual who resides in New Jersey, is the Bishop of the Byzantine Catholic Eparchy of Passaic. Mr. Burnett is also an attorney licensed to practice law by the State of California. Mr. Burnett purposefully directed conduct toward the State of Arizona.

7. Defendant Eparchy of Passaic, also known as the Byzantine Catholic Eparchy of Passaic, is a New Jersey non-profit corporation.

8. Defendant Burnett, an employee/agent of the Eparchy of Passaic, directed conduct toward the State of Arizona; such conduct was done in the course and scope of his employment/agency. Accordingly, the Eparchy of Passaic is liable for the actions of Defendant Burnett pursuant to *respondeat superior*.

9. Defendant Milan Lach, a single individual who resides in Ohio, is the Bishop of the Byzantine Catholic Eparchy of Parma. Mr. Lach purposefully directed conduct toward the State of Arizona.

10. Defendant Byzantine Catholic Diocese of Parma, also known as the Byzantine Catholic Eparchy of Parma (hereinafter "Eparchy of Parma"), is an Ohio non-profit corporation.

11. Defendant Lach, an employee/agent of the Eparchy of Parma, directed conduct toward the State of Arizona; such conduct was done in the course and scope of his employment/agency. Accordingly, the Eparchy of Parma is liable for the actions of Defendant Lach pursuant to *respondeat superior*.

12. As set forth in detail below, Defendants acted in concert or aided and abetted tortious activity and perpetuated a scheme and artifice to harm Plaintiffs for the benefit of some or all of the Defendants.

13. Defendants ABC Entities 1 – 10 are unknown fictitious business entities that are liable for the conduct alleged below. If and when their identities are known, the Plaintiffs will move to amend the case caption.

14. Defendants John and Jane Does 1 - 10 are unknown fictitious individuals who are liable for the conduct alleged below. If and when their identities are known, the Plaintiffs will move to amend the case caption.

## JURISDICTION AND VENUE

15. Jurisdiction and venue are proper in the Court because this complaint arises from acts and events that out-of-state Defendants directed at the Byzantine Catholic Eparchy of Phoenix ("Phoenix Eparchy.")

16. The Phoenix Eparchy is headquartered in and provides ecumenical services in Maricopa County.

17. The majority of the tortious conduct, events, acts, and omissions alleged in this Complaint occurred within or were directed to Maricopa County, Arizona.

18. The amount of Plaintiffs' damages qualifies this matter as a Tier 3 case.

## FACTUAL ALLEGATIONS

19. In late 2015, Plaintiffs met with the Phoenix Eparchy about providing legal services. These meetings resulted in the execution of three contracts between the Phoenix Eparchy and Plaintiffs for Plaintiffs to 1) investigate the Phoenix Eparchy's current health plan; 2) to draft health plan documents; and 3) to pursue litigation on behalf of the Phoenix Eparchy.

20. The Phoenix Eparchy retained Plaintiffs as legal counsel to assist in investigating irregularities in the 2012 Eastern Catholic Benefits Plan ("ECB Plan"), a health plan.

21. As a sponsor of the ECB Plan, the Phoenix Eparchy paid monies into the ECB Plan, which was then required to use those funds to pay for medical costs of the Phoenix Eparchy's employees and their families.

22. Phoenix Eparchy's employees and their families are beneficiaries of the ECB Plan.

23. A plan sponsor like the Phoenix Eparchy has fiduciary obligations to the beneficiaries of the plan, including a legal obligation to ensure the plan is properly formed and administered.

24. Federal law holds this duty is <u>paramount,</u> and that fiduciaries must discharge their duties "solely in the interest of the participants and beneficiaries." 29 U.S. Code

4

§1104(a)(1). Accordingly, the Phoenix Eparchy was required to know how the ECB Plan was formed, operated, and maintained.

25. Little did the Phoenix Eparchy and Plaintiffs know, simply *asking* for the formation documents and how the 2012 ECB plan was maintained would uncover tortious conduct and, upon information and belief, a criminal conspiracy. *See generally, Byzantine Catholic Eparchy of Phoenix v. Employee Benefit Services, Inc., et. al.* Case No. 2:18-cv-01288-GMS, Amended Complaint. (Dkt. 17)("Federal Case").

26. The individuals and entities that handled ECB Plan funds included Defendant Skurla, as well as others named as defendants in the Federal Case.

27. At first, Plaintiffs and the Phoenix Eparchy simply attempted to review the 2012 ECB Plan, a contract, and requested an accounting from the individuals and entities the Phoenix Eparchy knew to be plan fiduciaries since they handled plan funds. *Id.* at ¶90.

28. Several defendants in the Federal Case refused to provide the requested documentation and information. Without a legitimate basis to do so and in violation of ERISA and/or state law, the defendants in the Federal Case also <u>refused</u> to identify the Plan's fiduciary(ies) and/or plan administrators.

29. They also failed to provide an accounting of funds.

30. From what Plaintiffs were able to uncover, they learned of numerous issues with the ECB Plan demonstrating that the plan was not valid and not in compliance with state and/or federal law.

31. For example, in the ECB Plan document, the ECB Plan <u>itself</u> was named as the plan administrator. In other words, the contract *purported to be written and administered by itself. Id.* at ¶67. An employee benefit plan cannot administer itself, as it is a legal impossibility.

32. The 2012 ECB Plan suffered from defects in formation, documentation, and operations which rendered it nonexistent and void. The only way to resolve this issue was for there to be an accounting and then a reformed plan implemented.

33. When these critical failures were pointed out, certain defendants in the Federal Case simply attempted to rewrite the plan and then merge it with other health plans from other employers, namely the Eparchies of Pittsburg, Passaic, and Parma. Which are lead by Defendants Skurla, Burnett, and Lach, respectively.

34. Then, although the Phoenix Eparchy had not signed an adoption agreement accepting the merger, certain Defendants in the Federal Case fraudulently attempted to pass off this "new plan" as the operative plan. Am. Compl. ¶91 (Dkt. 17)

35. This new plan illegally merged two other plans, resulting in the comingling of funds. *Id.* at ¶92.

36. Since Phoenix Eparchy had not executed an adoption agreement, this comingling resulted in another ERISA and/or state crime.

37. The attempted change and merger were illegal; which only served to confirm to Plaintiffs and Phoenix Eparchy that there were errors in the 2012 plan.

38. Plaintiffs eventually also discovered troubling evidence that caused them to believe that ECB Plan funds were being held in an off-shore account in Bermuda. *Id.* ¶¶103 – 109.

39. Eventually, after the Defendants named in the Federal Case continued to wrongfully refused Plaintiffs' requests for information that the Phoenix Eparchy and the beneficiaries were entitled to receive as a sponsor of the ECB Plan, simply asking for voluntary disclosure of required information became futile and litigation was necessary.

40. On April 26, 2018, the Phoenix Eparchy filed suit in Arizona District Court, original Complaint (Dkt.1) *Byzantine Catholic Eparchy of Phoenix v. Employee Benefit Services, Inc., et. al.* Case No. 2:18-cv-01288-GMS. The original complaint named Employee Benefits Services Incorporated ("EBS"), Bert Reimann, and Janet Dicks' (collectively "EBS Federal Defendants") and Meritain Health, Inc. as Defendants.

41. On June 18, 2018, the Phoenix Eparchy filed an Amended Complaint, adding additional parties as defendants: Administration Committee of the Eastern Catholic Benefit Plan, William C. Skurla, and Robert Shalhoob. *See* Federal Case (Dkt. 17).

42. Several of the defendants in the Federal Case filed Answers to the Amended Complaint. (Dkt. 25, 27, 35, and 36). The Answers alone provided strong evidence that there were significant violations of ERISA and/or state law issues with how the plan was both established and run.

43. In fact, the EBS Federal Defendants' Answer in the Federal Case *indisputably proves* the failure of the fiduciaries, prohibited transactions, and the conversion of funds.

44. The EBS Federal Defendants admit that the ECB Plan Administration Committee consisted of Defendants Riemann, Skurla, and Shalhoob. *See* EBS Defendants' Answer to Amended Complaint at ¶ 19 (Dkt. 36).

45. An administration committee has fiduciary obligations in the administration of funds. Yet, when responding to Phoenix Eparchy's allegation that Reimann, Skurla and Shalhoub, as well as the Administration Committee, had fiduciary obligations under ERISA and/or common law, the EBS Federal Defendants *impossibly* denied any fiduciary obligations. *Id.* at ¶¶ 12, 20, 22, and 24.

46. The EBS Federal Defendants admitted that the Phoenix Eparchy signed an account registration and agreement for a joint checking account with EBS. *Id.* at ¶ 40.

47. Yet, a fiduciary may never put beneficiary funds into a personal or business account; the funds must be held in a separate trust account. In doing so, the EBS Defendants admitted that numerous violations of statute and regulations had occurred, as well as conversion of ECB Plan assets.

48. Furthermore, Defendant Burt Reimann wrote himself checks from this joint checking account; thus constituting another conversion of ECB Plan assets. *Id.* at ¶¶ 99 and 114.

49. The ESB Federal Defendants admitted that the ECB Plan documents state that not only is the ECB Plan sponsored by itself – a legal impossibility since only an employer can be a sponsor of an employee benefits plan – but that the administrator of the ECB Plan was the ECB Plan, yet another legal impossibility. EBS Defendants' Amended Answer at ¶¶ 75 and 76 (Dkt. 27).

50. Furthermore, the law requires an administrator must be an identifiable, natural person.

51. Almost immediately after the filing of the Federal Case, Defendant Skurla began a campaign of improperly interfering in the contract between the Phoenix Eparchy and Plaintiffs.

52. Defendant Skurla repeatedly requested that the Phoenix Eparchy terminate the contract with the Plaintiffs.

53. Defendant Skurla repeatedly defamed Plaintiffs during his campaign to interfere with the contract. He stated Plaintiffs were greedy and inexperienced. He lied about the fees that would be owed to the Plaintiffs. Defendant Skurla stated Plaintiffs only wanted to "make a name for himself," and that the lawsuit had absolutely no legal merit.

54. Defendant Skurla communicated these false statements to the Phoenix Eparchy via e-mail.

55. Defendant Skurla communicated these false statements to the Phoenix Eparchy via phone, at times leaving voicemails.

56. Defendant Skurla communicated these false statements to the Phoenix Eparchy via correspondence/letters.

57. Defendant Skurla also communicated these false statements in personal meetings held with Bishop John.

58. Eventually, the Bishops of Parma and Passaic, Defendants Lach and Burnett, respectively, joined Defendant Skurla's efforts to interfere with the contract between Plaintiffs and the Phoenix Eparchy.

59. Defendants Burnett repeated these false and defamatory statements.

60. The false and defamatory statements were made in the furtherance of the alleged conspiracy as the Eparchies of Pittsburg, Parma, and Passaic claimed to have "merged" health benefits plans with the Phoenix Eparchy's plan.

61. Since the Phoenix Eparchy had not signed an adoption agreement, this "merger" was actually a conversion.

62. These individual Defendants even communicated these false statements to others in the Catholic Church and directed those individuals to urge the Phoenix Eparchy to fire Plaintiffs and terminate the lawsuit.

63. In July 2018, a meeting was held with Defendants Skurla, Lach, Burnett and Cardinal Sandri, as well as multiple representatives from the Phoenix Eparchy, including Bishop John.

64. Once again it was communicated to the Phoenix Eparchy that it needed to dismiss the Federal Case and to fire Plaintiffs.

65. This interference was clearly done with the intent to hide the improper, potentially criminal, activities of these Defendants.

66. Additionally troublesome is that Defendant Burnett is a licensed attorney who engaged in communication regarding an ongoing lawsuit with a party he knew to be represented by legal counsel. Even after Defendant Burnett was reminded that the Eparchy of Phoenix was a represented party, he again communicated with them *and* provided legal advice in violation of Rule 4.2 of the California Rules of Professional Conduct.

67. Defendants even threatened to seek the termination of Bishop Pazak if he did not terminate the Phoenix Eparchy's contract with Plaintiffs.

68. Under ERISA and state law, it is improper to retaliate against an employee who is exercising rights related to their health benefit plan.

69. Defendants' repeated efforts were rebuffed by Bishop Pazak and the Phoenix Eparchy and the Federal Case continued.

70. Upon information and belief, after these repeated efforts failed, Defendant Skurla "went up the chain of command" communicating to the Papel Nuncio that the Phoenix Eparchy would not terminate the Plaintiffs or dismiss the Federal Case. Defendant Skurla then obtained an order from the Pope to dismiss the Federal Case and fire Plaintiffs.

71. When Bishop Pazak did not follow the Pope's directive, he was removed from his position as Bishop of the Phoenix Eparchy and replaced by Bishop Thomas Olmstead.

72. In August 2018, Bishop Olmstead notified Dean Burri that he and his firm were fired and Phoenix Eparchy's contract with Plaintiffs was terminated.

73. Bishop Olmstead also instructed Phoenix Eparchy's other legal counsel, Susan Martin, who had been serving as co-counsel with Dean Burri prior to his firing, to dismiss all claims asserted in the Federal Case. Bishop Olmstead instructed Susan Martin to dismiss the Federal Case despite the significant violations of federal and/or state law that had been admitted to in the defendants' Answers.

74. The Phoenix Eparchy, at the direction of Bishop Olmstead and the Pope, dismissed the Federal Case with prejudice and without recovering anything. The dismissal with prejudice of the Federal Case did not benefit Phoenix Eparchy and allowed the defendants, including Defendant Skurla, to escape liability for their wrongful conduct and avoid discovery of potentially criminal acts.

75. To date, Plaintiffs have not received the funds owed to them under the contracts executed with the Eparchy of Phoenix.

76. Upon information and belief, the Phoenix Eparchy is not paying Plaintiffs' legal fees at the direction of Defendants Skurla.

77. The Phoenix Eparchy's breach of the fee agreements and wrongful refusal to pay the legal fees and expenses due and payable to Burri Law is the subject of a separate

action filed in the United States District Court for the Middle District of Florida, where Burri Law has petitioned the court to compel the parties to arbitrate their fee dispute per the terms of the fee agreements.

78. Shortly following the wrongful termination of the contract with the Phoenix Eparchy, Monsignor Andrew Anderson, a consultant who identified as "of counsel" for Plaintiff Burri Law, P.A., was suddenly ordered by the Archbishop of Miami to cease working for Plaintiffs and remove all reference from Plaintiffs' website.

79. Monsignor Andrew Anderson had a contractual relationship with Plaintiff Burri Law. Monsignor Anderson had consulted with Plaintiffs for approximately four years. Plaintiff Burri Law billed for Monsignor Anderson's work.

80. Upon information and belief, Defendant Skurla and/or the other Defendants improperly urged and/or ordered the Archbishop of Miami to order the termination of the contractual relationship between Plaintiff Burri Law and Monsignor Anderson.

81. Upon information and belief, Defendant Skurla and/or the other Defendants defamed Plaintiffs when he urged the Archbishop of Miami to issue the order to Monsignor Anderson.

82. Since Monsignor Anderson was ordered to terminate his relationship with Plaintiffs, Plaintiffs have been unable to find another priest who is a cannon lawyer willing to perform the same work as Monsignor Anderson.

83. Since the improper interference that resulted in Plaintiffs' termination and the loss of a valued and valuable contractual relationship with Monsignor Anderson, Plaintiffs experienced a drop in business from clients associated with the Catholic Church.

84. Upon information and belief, certain Defendants or others associated with these Defendants, continue to interfere in Plaintiffs' contractual relationships with clients.

85. Upon information and belief, certain Defendants or other associated with these Defendants have made and continue to make statements that Plaintiffs are unqualified, incompetent, or unable to perform quality legal work.

86. These untrue statements have resulted in the loss of Plaintiffs' clients and a substantial drop in business.

87. As recently as July 2020, long-term clients of Plaintiffs have suddenly terminated their contracts with Plaintiffs in a manner similar to the way the Phoenix Eparchy terminated Plaintiffs.

88. These terminations have and will continue to have long lasting financial implications for Plaintiffs, resulting in hundreds of thousands of dollars of lost revenue.

89. Plaintiffs have had numerous meetings with potential clients where a relationship was almost formed, yet, the prospective clients suddenly change their minds.

90. These potential clients would have retained Plaintiffs; however, upon information and belief, once Defendants or others associated with Defendants learned of the expected business relationship with Plaintiffs, they ordered the potential clients not to enter into a business relationship with Plaintiffs.

91. These Defendants should be held jointly and severally liable as they were acting in concert and/or they were acting as an agent or servant of one another.

92. Defendants conduct was guided by an "evil hand and evil mind." They have taken the actions alleged above, upon information and belief, to hide criminal activities.

93. Additionally, Defendants conduct was not limited to terminating the lawsuit that would likely uncover the alleged wrongdoing. Defendants malice towards the Plaintiffs has resulted in a concerted effort to ensure they never work with another Catholic Diocese again. Such egregious conduct warrants the imposition of punitive damages.

## COUNT I

### INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

94. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

95. Defendants were aware of the Phoenix Eparchy's contract with Plaintiffs.

96. Defendants were aware of the Plaintiffs' contract with Monsignor Anderson.

97. Defendants, upon information and belief, are also aware that Plaintiffs have contracts with numerous other Catholic entities.

98. Defendants made numerous false and defamatory statements, as set forth above, to the Phoenix Eparchy and to others, including the Archbishop of Miami.

99. Defendants improperly and intentionally interfered in the contracts between Plaintiffs and the Eparchy Phoenix, proximately causing the breach and termination of the contract.

100. Defendants' improper and intentional interference with Plaintiffs' contract with Monsignor Anderson proximately caused the termination of that contract.

101. Defendants' improper and intentional interference with Plaintiffs' contracts with other clients proximately caused the termination of those contracts.

102. Defendants interference was done with a malicious intent to hide their alleged wrongdoing and/or to further financially harm Plaintiffs without justification to do so.

103. The termination of these contracts damaged Plaintiffs in an amount to be proven at trial.

### COUNT II
### TORTIOUS INTEREFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONSHIPS

104. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

105. Defendants were aware of the class of clients, the various dioceses of the Catholic Church who need legal assistance with their employee benefit plans, that Plaintiffs seek to enter into contractual relationships with and perform work for.

106. Plaintiffs estimate that there are approximately 175 Catholic dioceses in the United States.

107. Upon information and belief, Defendants were aware of specific potential clients that Plaintiffs were intending to enter into contractual relationships with.

13

108. Plaintiffs have a history of working with Catholic dioceses and had a reasonable expectation of entering into profitable, contractual relationships with additional dioceses.

109. Upon information and belief, Defendants improperly and intentionally interfered with those prospective contractual relationships.

110. Such interference induced or otherwise caused prospective clients to either not enter into or to discontinue prospective business relationships with the Plaintiffs.

111. Plaintiffs have been damaged by this loss of business in an amount to be proven at trial.

## COUNT III

## UNJUST ENRICHMENT

112. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

113. Defendants were aware of the contracts as described above.

114. By encouraging, facilitating, and coordinating the termination of the contract with the Phoenix Eparchy, the Defendants received a benefit.

115. For example, by terminating Plaintiffs' representation of Phoenix Eparchy and forcing a dismissal of the Federal Case, Defendants continued to hide their actions that violated ERISA and/or common law and resulted in personal financial benefits.

116. Each of the individual Defendants are employees/agents of the Eparchies that claimed to have "merged" with the Phoenix Eparchy's health plan. Additionally, Defendant Skurla avoided continued litigation, including discovery, which may have led to a criminal investigation.

117. Plaintiffs were impoverished because they were unable to continue performing services under the various fee agreements and receive fees for those services.

118. Plaintiffs were also impoverished by not receiving the services of their valuable independent contractor, Monsignor Anderson.

119. There is a connection between Plaintiffs' impoverishment and Defendants' enrichment.

120. There is no justification for the Plaintiffs' impoverishment and Defendants' enrichment.

121. If Plaintiffs are not entitled to relief under other causes of action, then no remedy exists.

122. Plaintiffs are entitled to the amount of damages and/or equitable relief necessary to compensate Plaintiffs and/or make Plaintiffs whole.

## COUNT IV
## DEFAMATION PER SE

123. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

124. As set forth in more detail above, Defendants made false statements of fact, namely claiming that the Federal Case had no merit and, among other statements, that Plaintiffs were unable to handle such matters.

125. Defendants also made false statements about Plaintiffs' quality of work, skills as a litigator, and other statements implying that Plaintiffs are not competent, qualified attorneys.

126. Defendants published such statements to Third Parties, including numerous representatives of the Phoenix Eparchy, former clients of Plaintiffs, and potential clients of the Plaintiffs.

127. Bishop Olmstead, acting in the course and scope of his agency with The Phoenix Eparchy has re-published these false statements as recently as mere months ago in a malpractice action filed in early 2020.

128. Defendants knew at the time of making the statements that such statements were false and/or they were negligent in determining the truth of such statements.

129. In fact, some of the statements were made in furtherance of the conspiracy alleged in the Federal Case.

130. Upon information and belief, Defendants continue to publish such statements in efforts to discredit Plaintiffs and hide ongoing, improper conduct.

131. Such statements impugned the honesty and integrity of Plaintiffs and damaged their professional reputations.

132. The statements also materially harmed the Plaintiffs in an amount to be proven at trial.

WHEREFORE, Plaintiffs Burri Law, P.A. and Dean Burri pray for relief against the Defendants as follows:

    A. For compensatory damages in an amount to be proven at trial;

    B. For pre-judgment interest at the statutory rate on all liquidated sums:

    C. For post-judgment interest at the statutory rate;

    D. For punitive damages in an amount to be proven at trial;

    E. For equitable relief to make Plaintiffs whole;

    F. For any such further relief this Court may deem just and proper.

Dated this 27th day of July, 2020.

RADER MAYROSE LLP

By /s/ Jamie Mayrose
Deanna R. Rader
Jamie L. Mayrose
Attorneys for Plaintiffs